Good morning, and may it please the Court, Marcelle You have to wash your ears out from the last argument there. That's right, Your Honor. Marcelle Stewart on behalf of Mr. Ortega-Castellanos. At the trial court level, there were numerous evidentiary errors, Your Honor, that cumulatively raised to the height of the need to reverse this case, Your Honor. In order to understand those errors, however, you have to understand the facts behind the plausible defense that Mr. Ortega raised. On September 17th at about 3.30 in the morning, he sought entry to the U.S. through the Calexico-California Port of Entry, driving a GMC truck. The primary officer asked him or observed the truck, saw that there was a propane tank on there, and asked him if it had propane. He said that it did. The officer decided to refer him to secondary for further inspection. However, on testimony, he indicated that Mr. Ortega did not exhibit any type of nervous demeanor or behavior. In secondary inspection It doesn't matter, right? The officer can refer to secondary for any reason or no reason, right? Yes, Your Honor. The reason why that fact is important, Your Honor, because it's going to go to this plausible defense that Mr. Ortega had to the case, which was that in that same truck, Your Honor, before Mr. Ortega gained possession of it, another individual named Mr. Alfredo Fernandez-Lora, they were crossing records for about a month and a half period where he crossed in that truck for about 17 to 20 times, and he was later arrested and successfully prosecuted for drug smuggling. In that truck? Not in that truck, Your Honor. In another vehicle. And so the defense, Your Honor, was that these drugs were placed in that vehicle before Mr. Ortega gained possession of the vehicle by this individual, Mr. Fernandez-Lora, who was subsequently prosecuted for drug smuggling. Now This was presented to the jury, right? It was presented to the jury. As a theory, and the jury didn't buy it. Well, that goes, Your Honor, to some of these evidentiary errors, Your Honor, that were alleged. I understand, but the fact is the jury was presented this theory, and subject to these objections, given what it heard, it didn't buy this story, right? That's correct, Your Honor. There are any number of ways they could not have bought the story. They could have thought that, in fact, this truck might have been owned by a drug dealer, but that he didn't use it for that purpose. Or they could have thought that this guy is in cahoots with your client, and, in fact, they're part of the same business, right? That's correct, Your Honor. But if you look back to the trial and how it played out, Your Honor. And they also have records of your client going back and forth in this vehicle since the drug dealer had it, right? Yes, Your Honor. There were three instances. The arrest happened on September 17th, and on September 2nd, September 5th, and September 16th, my client crossed the port of entry in the vehicle. Now, the reason why I think the evidentiary errors impact the case is that the government failed to provide, in a timely fashion, material that was core to the government's case-in-chief that rebutted Ms. Dorotea's defense. And that evidence was that on one of those occasions where Ms. Dorotea crossed in the vehicle on September 2nd, that a narcotic detector dog was used to search the vehicle and didn't respond to the presence of narcotics. The way that that impacted cases, Your Honor, the case, Your Honor, was that ---- I'm sorry. I just want to make sure I follow what was not provided. What was not provided was the evidence of the dog sniff, right? Exactly, Your Honor. And that, Your Honor, became ---- Not evidence of the crossing. He did have information about the three prior crossings. Yes, Your Honor. And he knew that the government had evidence. I guess they now keep track of every license plate that comes across the border. I believe so, Your Honor. Yes. And what he was not told is that there would be the additional evidence of the dog sniff. Exactly. And that was critical, Your Honor, because ---- And why were you entitled to that? We were entitled ---- It's not Brady, right? That's correct, Your Honor. It's certainly not Calpatori. That's correct, Your Honor. And it's not Jenks. However, Your Honor, we were entitled to it under Rule 16A1E, Your Honor, because the government was using it as part of its case in chief. And so the government didn't choose to use it solely as rebuttal, but use it instead in its case in chief. And as such, we were entitled to it, particularly given that we had requested that information about five months prior. How did the government ---- I'm sorry. How did the government ---- I mean, I'll just tell you. And the thing I found most troubling was the denial of the continuance for that reason. But how was the government planning to use the evidence in its case in chief? The government, through discussions and through pretrial motions, the government knew if we disclosed that our main defense was that this other individual, Mr. Flannis Laura, had previously perhaps loaded the vehicle. And so the government ---- And your client was unaware that there were drugs in the truck. Exactly, Your Honor. Okay. And so the way that the government used this narcotics detector dog, in addition, basically it bolstered its defense saying that, well, on a couple of occasions, Mr. Ortega was inspected, but on one particular occasion, a narcotic detector dog was used. And basically making the argument to the jury that surely had these drugs been in there, a narcotic detector dog would have caught these drugs because on the date of arrest, it was a narcotic detector dog that, of course, found the drugs in the vehicle. And so that's why the failure to produce that evidence, but yet the government used it in its case in chief, became so troubling, so much so that where the trial court even indicated that it was material to the defense, the government was going to use it in its case in chief, and the trial court ordered it produced. The problem is, is that we didn't get the evidence until part of it on the first day of trial, the morning of, and part of it on the second day of trial. And by getting it so late... Had you made a proper discovery request? I made, Your Honor, about five months, I believe, before. In a discovery letter, I requested any evidence of narcotic detector dogs that the government would be introducing. That's not the proper way to make a discovery request, right? Well, Your Honor, I did not file at that time a motion to compel because the government had not responded, indicating that there was any evidence, but yet there was an objection to producing it. So I was unaware, in response to my request, that there was any evidence. And my thought was that under Rule 16, the government had the affirmative obligation to produce in a timely manner evidence that they would use in their case in chief. Is that the practice in the Southern District? I mean, I don't know. Is that a practice where you make an informal request and the government always responds? I mean, I don't know. It may well be the case. Different districts have different practices. I think that having been both with the U.S. Attorney's Office there and now on the Defense Council, I haven't been with the U.S. Attorney's Office there and now on the other side of this. I do think that the government endeavors to respond to an informal request. And I believe here, I'm not saying that there's any... Well, that's quite different. Saying they endeavor to do it, as a matter of good will, is quite different from saying there's an established practice that, you know, if you make an informal request, they will come back and they have a problem and you can count on it. I mean, I'm trying to get... So otherwise, I'm not sure, not having made a formal request as the rules require, how your informal request helps you. Your Honor, I would more affirmatively indicate, Your Honor, that not just do they endeavor, that they will provide that information, or they would indicate that there would be a basis for them withholding it. I think what occurred here simply is just that either it fell through the crack or the government did not realize until later in the game that it was going to use that evidence. And now what I... If I remember correctly, you did eventually file a discovery request with this court, right? Yes. A motion to compel, right? Yes, and specifically, I filed, as soon as I found out about it, I filed a... I subpoenaed that evidence, Your Honor, from the actual court director. How did you find out about it? About 12 days, I believe, before trial, a government counsel indicated and produced a copy of a document indicating that there was a narcotic detector dog search. And at that point, that's when I filed, I filed a subpoena... I'm sorry. So 12 days before trial, you know that they're going to bring in this evidence that during one of the earlier passages of your clients through the border checkpoint, whatever it's called, the customs border checkpoint, that there was a detector dog. Yes, Your Honor. And so I... That's 12 days before trial. What then is it that you were missing? But I wasn't provided any of the information that I could then challenge, essentially, either the qualifications, the reliability, or put on any type of a meaningful challenge cross-examination to that evidence. So then I requested it, I subpoenaed it, the government... Let me just slow you down. So what they say to you is a dog sniff was conducted. They don't tell you the name of the dog or any details like that. Correct. Did you ask for that? I did, and then I subpoenaed it directly. When did you ask? Immediately. Immediately. And I don't think there's a dispute about my request for it. And then I... Did the government refuse to provide it to you? Yes, the government's practice, at least down in San Diego, is not to provide that information. And pretty affirmatively, they take the position that that information is not to be disclosed in discovery. And so in response to my subpoena, they filed a motion to quash. And then that was not heard until the morning of trial. And so that's how we got to the point of trial. So you made the request immediately, and when did you file your subpoena? I don't have that date in front of me. I believe it was the next day after this, after the... 11 days before trial. Exactly. And they filed a motion to quash. Do you remember when? I don't actually. I didn't put that date in front of me. I will look forward, but I believe, Your Honor, that... What's your best recollection? Your Honor, I believe my best recollection is that all of this happened probably, and I may have been wrong. I may not have filed it the very next day. I probably filed it within three days of getting that information. They filed their motion to quash perhaps the next day, and then I filed a response. So we're talking within about a week or so, Your Honor, a week to nine days before trial. So it comes from a hearing on the day of trial. Exactly. There's a hearing on the day of trial. And at that hearing, the court ultimately ruled essentially in my client's favor that this material needed to be produced. The court wanted to understand from the prosecution, how did you intend to use this? And the government indicated they intended to use it in their case in chief to rebut our court offense. And so when the court learned that, the court ruled that it was definitely material to our defense, but it was also a significant part of the government's case in chief, and so it should have been produced. It should be produced. Well, the court said it was highly material. Yes, Your Honor. To be produced. Yes, Your Honor. And now the challenge, however, is that I request a continuous at that time, because now I'm receiving some degree of narcotic detector dog evidence during or at least at the beginning of trial. I don't have an adequate opportunity to prepare the defense. Now, this evidence, the sole purpose of it is to rebut our court offense. And so I wanted the opportunity to either get an expert to help me understand the narcotic detector dog evidence I was receiving. I also indicated that I wanted an opportunity to try to obtain additional information about this narcotic detector dog from the government, so that I can prepare a meaningful defense to this evidence. What the court did do, the court did require that some of the information be produced the first day. The court required that some of the information be produced the second day of trial. And the court allowed me to question the narcotic detector dog handler that the government had available. That presented some more issues, because upon questioning the narcotic detector dog handler, I learned that there were various circumstances under which the reliability of a narcotic detector dog would be diminished. If they were overworked, if they were sick, a variety of other things. And the handler told me that they're regularly overworked, and things of that nature. And so now I wanted the opportunity to try to get any records of staffing records for the dogs that weren't staffed that day, and the extent to which they were worked or overworked, so that I would be able to use that information to counter this, to prove that, wait a minute, jury, that this information doesn't mean... The handler did testify, Your Honor, and the handler did indicate that under a variety of circumstances that a narcotic detector dog, their reliability would be diminished. The problem is, is that the handler did not know which dog was used on that day, and what the circumstances were for that particular dog. So other than this general information, I was unable on the spur of the moment to get from that handler the specifics as to whether this dog that the government is saying would have alerted, whether there's reason to put before the jury, that no, this dog may not have alerted because he was overworked, he was sick, he was dehydrated. Is that kind of information available? Does the government have information as to which dog was used? At this point, Your Honor, I'm still not sure about that. But I would suggest that... Did you ask that question? Well, that was one of my bases. I requested the information. Once the court ruled that there would not be a continuance, I at that point just set about preparing using what was available to me at that time. I have the records show that the dog Carly was used on that day. I'll look back to the excerpt, but I don't believe that they knew what dog was used on the date of the September 2nd inspection. Now, on September 19th, or September 17th, when actually my client was arrested, they did know which dog was used on that particular day. And the handler was the handler for that particular dog. I don't believe that they knew the actual dog used on the September 2nd inspection. How did they present the dog sniff evidence, the September 2nd dog sniff evidence? How was that presented to the government? Well, the way the government introduced the evidence, basically the government walked the horse right up to the water and, you know, and let the jury drink for itself. So essentially the government used the secondary inspector who testified that I conducted basically the seven-point inspection, and then I called for a narcotic detector dog to inspect the vehicle. The narcotic detector dog came, inspected the vehicle, and Mr. Ortega was allowed to leave. So the government did not explicitly say that the dog fell to alert. But it was implicit in the way that it was presented to the jury. And mind you, this evidence was presented to the jury in opening. It was presented to the jury, of course, during the government's case in chief, and then it was hammered home during the closing argument. So it was significant to the government's case and very prejudicial to our case. And I would submit to the... So how were you actually prejudiced? We were prejudiced because the late production, I believe, deprived us of an opportunity to meaningfully prepare our defense and to defend against something so material to our core defense and so material to the government's case in chief, particularly given that we later learned from Officer Plyburn that these dogs are not infallible, and that often they're overworked and they're in situations where their reliability has greatly diminished. And was that presented to the jury? That was presented to the jury, but the problem is, Your Honor... But that was presented to the jury. Yes, Your Honor, if you could get that out. The government doesn't present anything about the dog other than to say there was a dog that came sniffed and we let him go. And then you have a handler who... The guy who actually handles these dogs for the government says often they're wrong, often they're overworked, tired, and don't alert. I mean, what else could you have done? I mean, it seems to me that that was gold. I mean, it sounds to me like you did a great job for your client. I mean, he got convicted, but that happens, despite a lawyer's great job. But I can't imagine how you could have done better. What might have been helpful to your case, but I would want to weigh that against the other evidence of guilt, but what might have been helpful is to know was that specific dog on September 2nd overworked that day, sick that day, and you could have perhaps gotten that information about the specific dog, and then you also mentioned you wanted an expert. I'm not sure you even needed an expert if you could show that that particular dog was not performing that day. Yes, Your Honor, and I... Yes, that's certainly true, but that's why I asked the question ten minutes ago, five minutes ago. Did you ask for the information about what dog it was, and you gave me an answer that said everything but yes. No, I'm sorry, Your Honor. I did ask for that information from the government at that time, but then I also asked for the... You asked for the information which dog was... Yes. And you did that orally or... Orally. At that point, we were having some... After the court ordered the production of the evidence available, I spoke with government counsel. I spoke with Officer Plyburn. I did request that it was told to me that they didn't have it, that this was all that they had. So they tell you they don't have... They don't know what dog was on call September 2nd, is what you're telling us. Yes. Well, Your Honor, more specifically, they didn't have it right then, but it was not necessarily represented that the court... Did you ask them, do you have it somewhere else? Did you say you don't have it here? When I ask people, lawyers, do you have the records and say, I don't have it here. I say, well, do you have it somewhere else, like in your bag or something? Did you ask them that question? Your Honor, my recollection is that I specifically asked for it, Your Honor, but at the same time, we were in the middle of trial as well, and I knew that there was not going to be a continuance granted, and I was stuck with basically the information I had available to me at that time. And so I perhaps, Your Honor, I didn't feel that at that point, beyond asking for it, beyond asking for the continuance, I had to then shift my gears and get back to preparing and filing this case. Counsel, I think one of the concerns is that if the court should reverse on that basis and send it back, to give you the conceptual equivalent of a continuance, what assurance do you have that you would have additional information on that point were the case to go to trial again? Your Honor. You have plenty of time to find out. Today, representing here as an officer of the court, what reason do you give us to believe that you would get more information? Unfortunately, I can't guarantee either then or at this late date that there is additional information there. What I do believe, Your Honor, is that the same way that records are kept, the actual personnel that is staffed, that records are kept You made no efforts post-trial to find out this information. You didn't ask opposing counsel this morning when you were sitting there waiting for the case to be heard. You didn't ask, you didn't make any post-trial request for this information. That's correct, Your Honor, I have not made the How can we find prejudice if you haven't pointed to something? I mean, you think we can order, or we will order a new trial just based on a hope and a prayer that maybe you'll find out something? Well, Your Honor, it's not so much based on, and I understand the court's point, and it's a valid one, but it's not just so much in hope and prayer, it's that if there is a benefit of the doubt to be gotten, and if the government does have under Rule 16 the obligation to produce its case-in-chief information in a timely way, then all of that should inure to the benefit of the defendant as opposed to the benefit of the government, Your Honor. And I do understand the court's point that perhaps I should have made more post-trial efforts to secure the information, Your Honor, and in the future I'll do that, but benefits should inure to the defendant. And there are other, Your Honor, there are other evidentiary erroneous, evidentiary rulings that I believe cumulatively rise to the level where reversal is required. And I believe one of those would be there is this vessel transfer form that the court determined was not hearsay, Your Honor, but it's not hearsay. It's not being produced for the truth of the matter asserted. In fact, it's being produced exactly for the opposite of what it asserts. I would read the hearsay rule a smidge broader, Your Honor, such that if an issue is raised as to the truthfulness of the statement, and I believe that in the, I believe the ad vivum cumminus, which I cited, that it indicates, it talks about, you know, an issue as to the truth of the matter asserted. You have the Orr case where there was an exhibit in that case that the court determined was in fact hearsay, even though, and let me quickly refer here to the facts because they're slipping me here, but essentially what the government did in that case, the Orr, and I believe that is, Orr lives in Bangalore, America. Yes, Your Honor. And in that case, there were records, Your Honor, that were introduced where essentially the government, what the government sought to do was the government sought to introduce these statements. The argument was that they weren't hearsay, but the government wanted to introduce the statements so they could make the inference, and just one moment, Your Honor, let me briefly turn to the case so I can be more clear in my remembrance of this. Here we are. Okay. Basically what the court talked about here was that there was an inference that the proponent of the evidence wanted to make by basically saying that essentially the proponent wanted to get the inference that, well, just one moment, Your Honor. Okay. And the argument was that this guy's carrying a forged registration form, a task form, or whatever it is, and that the fact that this is a forged form is proof of his, that he's up to no good. You know, it's not particularly strong proof that he's up to no good, but it's some proof. It's a synthesis of hearsay. Yes, Your Honor, but the challenge is that before you get to what the government wanted to infer from it, you first get to the step, Your Honor, that the government has to really call into question the veracity at a core level of the statement itself. So the government calls into question the truth of these representations in this document, and I do agree that ultimately the government sought to disprove that, but before you even get to that step, the whole, you know, relevance of it at that point became the fact that Mr. Ortega-Castellanos had purchased his vehicle from Diane Hoyt, whether or not that was true. And so when you go to the truth of the matter, you're... But that they proved by other means, not by means of the statement. They were, in fact, introducing the statement, and they were actually bringing other evidence to disprove the truth of this content. It's almost a synthesis of hearsay. And I would argue that by adding the other evidence, that that compounded the issue, Your Honor, that essentially the government was allowed to bring in this document to really make the argument that this is... Counsel, the woman apparently had at one time been the owner of that vehicle. Yes, Your Honor. Okay, so she's there subject to cross-examination. Did she say who she did sell it to? No. And, you know, more specifically, the way the testimony came out during trial, she was the registered owner, but her actual, her son, was the one who actually owned it and used it for his company. So the son conveyed the vehicle. She didn't know who the son conveyed the vehicle to, so necessarily there was going to be some type of, if we want to call it, fraudulent conveyance. And there was never any evidence that Mr. Ortega in any way knew that whoever conveyed it was not Diane Hoyt or sought to in any way use a fraudulent document, because when he was stopped at the Port of Entry, one, he didn't present the document, and so he didn't rely on it in that regard. I thought he did hand it to the Border Patrol. No, Your Honor. He did not hand it to the Border Patrol. He in no way relied on the document when he sought entry to the, at the Port of Entry. What type of ownership did he give the investigator? He had indicated, he simply indicated, he did give, I believe he did give the vehicle registration, which showed Diane Hoyt as the registered owner. What he did not give is this second document that we're now talking about, the vessel transfer form that purports to transfer the vehicle from Diane Hoyt to Mr. Ortega. And so that document was later, you know, later found during an inspection of the vehicle after the arrest, after the arrest was made. But I would suggest, Your Honors, that, you know, being able essentially to introduce a document, to call into question the veracity of that document, so to put the truth at issue as some type of circumstantial evidence of intent and knowledge, I would suggest that that should fall within the hearsay realm. Because... Did you make any objection that this was some kind of evil conduct in light or improper under 404? One moment, Your Honor. I'm trying to recall if there was a 404 argument here. Or to the best of your recollection, did you make any argument other than hearsay? Your Honor, I do know, yes, the answer is yes. What I'm struggling to recall is the contours of exactly how that was made. Essentially, the prosecutor during the motion, I believe motion eliminates, wanted to argue that this was some type of method or scheme that was employed to smuggle drugs into the United States. And that it was a kind of a regularly conducted habit. I argued against that. The court agreed that that type of evidence should not come in. However, the court allowed this specific document to come in. So in response to your question, we definitely did discuss that, and it was raised during the motion to eliminate period. And the court ruled that, you know, evidence of a scheme or additional ways in using vehicles to bring drugs in where you fraudulently convey them, that would not come in, but this specific document would. Thank you, Your Honor. I have the belief that the court is going to want to talk mostly about the continuance issue. However, I do want to pick up on the last issue that we were talking about, at least briefly, the transfer document. Specifically, the import of that document. Because I think it was more important to the United States case than what Judge Kaczynski may have intimated. The import from the United States perspective was, this is a gentleman who knew how the port eventually worked. He actually crossed in that vehicle eight times prior to the arrest. Three of the times he was sent to secondary, and the judge, the United States tried to get all eight of those crossings into evidence, and eventually the judge only ruled the three that he was sent to secondary should come in. But the importance of the transfer document was, since the defendant knew he was carrying drugs, he wanted to do everything he could to make sure he wasn't sent to secondary. And although it wasn't asked for, I believe what all the defendants said, he was in the process of registering the car. And that was one of the factors the United States used to say that it was an adoptive admission. It was found, I misspoke, it was found in the glove compartment, and then he was asked about it? He was asked about ownership of the car, and he said, I'm in the process of registering it in my name, or something to that effect. So that was one of, for adoptive admission you need more than just possession. You need possession plus other indicia that ties the statement to the person you're trying to declare. And one of the ways to tie it was to that statement that I'm in the process of registering it, and it's a registration vehicle. It also, as I argued, has his name, of course, to have his signature. It has his driver's license number. It has the VIN number of the vehicle. This is the transfer document? This is the transfer document. But again, the main point I wanted to make here is the import is... It's an adoptive admission, and therefore not hearsay because it's an adoptive admission. Besides the fact that it's not offered for the truth of the matter asserted. It's not the truth of the matter asserted. But I agree. There's multiple ways that this can come in. But the import is, the reason why it was important to the United States case is because it shows the defendant was trying to avoid secondary. And tying that into the... It doesn't show that he was trying to avoid secondary. Well, why have basically a lie that says this is your vehicle? Because given his eight trips across this port in this vehicle recently, three of which he's sent to secondary, he wants to avoid secondary. Because secondary is where the drugs are found. I think the question is, how would a document like this help him avoid secondary? Right. Because it's a document you could potentially show to a primary officer and reduce suspicion. If you just have a... I don't understand that, how it would reduce suspicion. If the officer is suspicious that you're smuggling drugs, saying that you own the car, it shows that you have control over the car. And so if there are drugs, then you are the one who's smuggling them. The officers have a limited amount of vehicles they can send to secondary. So the more you can show that this is a normal occurrence, the less chance you go to secondary. Well, the officer might suspect stolen vehicle. So I guess it's been a long time since I've gone through the border, but you go through a primary. They get your license plate before you roll up, right? Yes. So the officer has that information on his screen? Frequently, yes. That's the typical way it is, right? Yes. And the officer might ask you for driver's license registration or something like that. Or might not. That's correct. There's some choice. But he might ask you for some documentation. And I guess the concern would be that if you provide your driver's license with the name of Smith, but then provide a registration with the name of Jones, they would say, well, why is Smith driving Jones' vehicle? That would certainly raise suspicion, both for it being a stolen vehicle and for it containing contraband. And the less connected you are to the car, the less you could show this is my car, the more likely you go to secondary. So if you provide your driver's license and it matches the registration and you hand those out? The less suspicion that's raised, the less likely you're going to be sent to secondary. Okay. So somehow I have in my records that the dog that searched on September 2nd was Carlin. That's correct, Your Honor. Okay. So you know which dog? Was the dog who conducted the narcotics? The port of entrance told us that was the dog that was working that day around that time. Did you tell counsel that? My recollection is approximately 12 days before trial. I am the officer. I ask you a yes or no question. Did you tell counsel which dog it was that conducted the narcotics sniff on September 2nd? Yes. The first time he would have found that out was in the morning of trial when the court ordered us to turn over the certification document for the two dogs. And that's in the supplemental excerpts of the record. So you had the name of the dog. So why were you ordered to produce information about the condition of the dog on that day? After the information, yes. Okay. Did you? Yes. Well, where is it? It's the supplemental excerpts of record. There was a motion to add documents to the United States supplemental excerpts of record,  So what was the condition of Carly that day? There are no records of – I asked specifically if there were records regarding Carly's search of the vehicle. And I was told there are none. I'm sorry, did you say 115? Yes. My supplemental excerpts end at 114. Right, which is why there was a motion which was granted by this court to add documents. Okay. Okay, so that's the document I have that shows it was Carly on September 2nd. Right, and then there are a number of other documents showing Carly's training. And was that all turned over to? That was turned over on the second day of trial upon order of the court. Okay, and you asked the Border Patrol agents or I guess the agents? Cousins of Border Protection officers. You asked them if they had? Additional documents. Documents concerning the condition of Carly on that day. No, I never asked that. I don't believe I was ever asked that. Isn't that the most relevant thing? Twelve days before trial, I turned over the document saying, hey, there was, we have at least one document that shows that on one of those secondary searches, a seven-point inspection was performed. We know who the officer that did it, and he asked for a dog. My recollection is that the, and they're not in the record, but the subpoenas that are then filed ask for the certification and training records of the dogs, which I don't know that he asked specifically for the name of the dog, but you would get that through. Now, we thought turning over the certification and training records to the dog, because we thought we had a good faith basis that those weren't discoverable, although I agree with the court that they ultimately were. Now, had he said, look, I understand we're fighting over certification and training records, but just give me the name of the dog, I think we would have been able to do that right away. But I don't remember that conversation happening. Well, the name of the dog would not have done him any good, right? Well, except I believe what Judge Wardlaw really wants to know is, hey, can you go back and say maybe that dog was working a lot that day, or was sick that day. Or was sick, or probably worked every day. I don't believe I was ever asked for that specific question, although he certainly made that argument in front of the court. Like, hey, that's something I would have liked to have known, but I don't believe. I guess to me that would be the most relevant thing, having these kinds of cases. Now, I doubt there's much out there for that, but I don't know. What I do know is that I asked, look, hey, once I found out, okay, this is the name of the guy that was working that day. I said, do you have any records that show what you did that day? And he's like, no. There's a guy, but not the dog. What's that? You had the guy. The dog handler. Yeah. I go around, I'm searching thousands of vehicles. There's no records or anything. I didn't specifically ask him, well, do you at least have records of how much he was working that week or that month? As I recall, the dogs are taken down the line as the cars are waiting for primary, right? There are different ways the dogs are used. Some are used in pre-primary. They're used at secondary, but they also walk them up and down the line of vehicles as they're waiting at the point of entry. That's what we call the pre-primary searches. Pre-primary. Yeah. I'm agreeing. So was Carly a primary searcher or a secondary searcher? All the dogs are utilized in both ways, but for this specific vehicle, he was used in the secondary inspection area. So that would be one specific dog you could point to. Yeah, and you did. Yes. Well, what I was actually, you know, is keeping track of all the cars that the dogs sniffed would be hard to believe that they have a record of that. They don't have records of that. I mean, they might have more of a record of when they do a secondary or might not. I don't even think. Look, he told me he wouldn't even have that. And they certainly. When they walk that endless line of cars, like this Tijuana? I believe it's the San Ysidro Port of Entry. Yes, San Ysidro. Yeah. So they, I mean, it goes as far as I can go four cars wide or six lanes, and they walk with the dogs. I mean, it would be very difficult to keep track of what all they sniffed. Yeah, but wouldn't they know, like, how many, like, the hours the dog worked, the health of the dog, that sort of thing? I don't know that he would know the health of the dog unless he just happened to remember. But he probably could. Let's see. I guess I don't know. I mean, don't they keep records on their dogs? When I asked, when the subpoenas came, the records that they keep, they keep the certification records for the year. So he's certified, he's tested, and he said, okay, this is a good dog. And then they keep the last 90 days of their training records. And that's what was turned over. They probably, I'm guessing to some extent, but they probably have what days he worked. So at least that would be one additional piece of information that could possibly help. But getting back to the prejudice argument, he got to make this argument already. Maybe it would have bolstered an iota to say, and in fact, he worked a double shift that day. So, you know, but he basically argued, look, dogs aren't perfect. They're like humans. But wasn't, was this whole thing really central to the government's case anyway? I don't think so, Your Honor. I think it was one small piece of the evidence. And I probably shouldn't have crammed it into a footnote. But basically, I did make a harmless, even if the court were to find that the defendant was prejudiced, I made a harmless error argument. And that's in footnote 13, starting on page 24 of the brief repellent. And basically, I cite in the supplemental justice record my entire closing argument. And I go through all of the evidence that we showed. And I believe the way, when I talked about the dog, I said, look, the day before, in the week or so, a couple of weeks before he was found with the drugs, he was sent to secondary three times. That meant six officers and a dog looked at it. And none of those people found it. And, you know, I made a really strong point distinguishing the primary officer on the day of arrest knew that there was something he had to look at in that propane tank after a cursory inspection, which is all they do in primary. Whereas, three officers in secondary, you know, are banging on the thing to see if, and they didn't find anything. And the dog. I mean, I certainly added that the dog was one of the seven inspectors that were looking at it before. And, again, that was just one of the pieces of evidence. You know, I don't want to just, you know, read the footnote, but there were a number of things about the day of arrest, which I said, the way he's the sole occupant of the vehicle, the door, it's got fresh paint on it, and the rest of the tank is all beaten up except for that one area. And this is, I mean, certainly Mr. Fernandez-Luera was in the truck, but he was in it a few months before. And, importantly, this truck, the truck Mr. Ortega is arrested in, has 66 kilograms of marijuana. The vehicle Mr. Luera is arrested in has, like, 30 kilograms. The idea is he gets across, he makes it with his 66 kilograms, but he just sells the car instead of doing anything with that marijuana. And then he goes back and tries again to get this half-size load through. Oh, and he gets caught that time. I mean, you know, I made that, I mean, it wasn't an unreasonable argument, but I said that it's improbable. But the point is, the dog was, I don't think, was emphasized. You can read the entire... I guess the idea that a drug dealer would forget about a load of marijuana is itself somewhat implausible. Right, and I made that point as well. Let me close it out. You know, it's a money-making proposition. The whole idea is to get it into the United States so you can make money. You don't just leave it there. Okay, thank you. You're welcome, Your Honor. Would you like a minute for rebuttal? Yes, Your Honor. Your Honor, the reason why the defense was more plausible, I think, than where the court's picking up right now, is that Alfredo Fernandez Lora, he was in the vehicle from, we know in terms of border crossing history, from late May through late June, all right? He was arrested, I believe, in early August, okay? Mr. Ortega did not, there were no records of him even having the vehicle until September. So what that means is that no one knows exactly at what point when this vehicle was loaded. And it may have been loaded up until the point that Mr. Fernandez Lora was actually arrested in another vehicle and taken to jail. So the idea was not simply that he loaded the vehicle and gave the vehicle away, but that perhaps the vehicle was loaded, he was also transporting another vehicle. Then he got, unfortunately, popped in that vehicle, and so the drugs essentially became a lost load. And so there was a timing issue where the drugs could have been loaded within the vehicle just before Mr. Fernandez Lora was arrested in the other vehicle, and so you had essentially a lost load. But the idea about the... Nobody else knew about it. Huh? Nobody else knew about it. He personally loaded the 66-caliber dinosaur weapon with 150 pounds? Your Honor, I don't purport to know exactly how it was loaded, when it was loaded, but in terms of my client's position was that he didn't load it or wasn't aware of it. Thank you for your time, Your Honor. Okay, thank you. This is how it was implemented. We are adjourned. Thank you.
judges: Singleton, Kozinski, Wardlaw